## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| ANTHONY D. BLOUNT, | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO. CIV-11-129-D |
| SOUTHWEST OKLAHOMA JUVENILE CENTER, STATE OF OKLAHOMA *ex rel.* OFFICE OF JUVENILE AFFAIRS, J. D. JOHNSON, | ) | |
| Defendants. | ) | |

### <u>ORDER</u>

Before the Court is Defendants' motion for summary judgment [Doc. No. 49].  Plaintiff timely responded to the motion, and Defendants filed a reply.

Plaintiff, a former employee of Southwestern Oklahoma Juvenile Center ("SWOJC"), asserts claims based on Title VII of the Civil Rights Act of 1964 ("Title VII"), alleging race and religious discrimination, a hostile work environment, and retaliation for the exercise of Title VII rights.  He also asserts a *Burk*[1] claim, arguing that his termination violated Oklahoma public policy.  Defendants seek judgment on all claims.

<u>Standard of review:</u>

Summary judgment is proper where the undisputed material facts establish that a party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A material fact is one which may affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  To avoid summary judgment,

---

[1]*Burk v. K-Mart Corporation,* 770 P. 2d 24 (Okla. 1989).

a plaintiff must present more than a "mere scintilla" of evidence; the evidence must be such that "a reasonable jury could return a verdict" for the plaintiff. *Id.* Although the facts and reasonable inferences therefrom must be viewed in the light most favorable to Plaintiff, *Swackhammer v. Sprint/United Mgmt. Co.,* 493 F.3d 1160, 1167 (10th Cir. 2007), to establish a "genuine" material factual dispute, he must present evidence to show more than "some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 45 U.S. 574, 588 (1986). Plaintiff cannot rely on his allegations, personal beliefs, or conclusory assertions, but must submit evidence outside the pleadings, consisting of affidavits, deposition transcripts, or specific exhibits, sufficient to create a factual dispute with regard to the issue on which judgment is sought. *Celotex*, 477 U.S. at 324; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

Where the undisputed facts establish that a plaintiff cannot prove an essential element of a cause of action, the defendant is entitled to judgment on that cause of action; the defendant is not required to disprove the claim, but may rely on "a lack of evidence for the nonmovant on an essential element" of the claim. *Adler*, 144 F.3d at 671. The burden then shifts to the plaintiff to "go beyond the pleadings and set forth specific facts that would be admissible in evidence" from which a rational trier of fact could find in his favor. *Id.*

The record before the Court:

Plaintiff, an African-American male, was hired by SWOJC on November 23, 2009, and he was terminated on October 7, 2010. Initially hired as a temporary employee, he became a full-time probationary employee in January, 2010,[2] and was assigned to work as a Youth Guidance Specialist

---

[2]It is not disputed that all employees hired by SWOJC are probationary employees for one year. If they successfully complete the probationary period, their employment is governed by the rules and procedures of the Oklahoma Office of Personnel Management.

at SWOJC in Manitou, Oklahoma, an Oklahoma Office of Juvenile Affairs ("OJA") medium security facility for juvenile delinquents and youthful offenders.   At all times during his employment, he was supervised by Defendant J.D. Johnson, an African American male, who was the SWOJC Institutional Program Coordinator, and has been employed at SWOJC since 1999.

As a Youth Guidance Specialist ("YGS"), Plaintiff was responsible for the direct care and supervision of the juvenile offenders.   He was classified as a YGS I, the entry level for the position. During his employment, there were four SWOJC units organized according to the classification of the residents.   Residents were classified as youthful offenders, sexual offenders, or juvenile delinquents.   Youthful offenders are those convicted of serious crimes, such as murder, rape, or first degree burglary, and juvenile delinquents are typically younger residents.   Deposition of J.D. Johnson, Plaintiff's Ex. 4, p. 25.

YGS staff are assigned to specific units by Mr. Johnson. In determining staff assignments, he considers several factors, including education, gender,  and previous work experience.  *Id.* at pp. 25-26.   YGS I staff are assigned only to a shift which is also staffed by a more experienced YGS. The policy is to have at least two staff members on each shift at each unit. *Id.*  Senior staff members were classified as YGS II, III, or IV, depending on their experience and performance, and they directly supervised the YGS I staff on their assigned shifts.

 Mr. Johnson is responsible for monitoring the job performance of new YGS staff by both direct observation and input from more senior staff, and he directly communicates with YGS staff regarding their performance. Johnson Affidavit, Defendants' Ex. 2 ("Johnson Aff."), ¶¶ 3-5.  These conferences include "coaching" to assist staff in understanding the rules and procedures, or counseling regarding performance issues.   If a YGS violates policy or procedure, Mr. Johnson

3

communicates with him orally or in writing, depending on the circumstances, and he sometimes imposes discipline. Johnson Dep., pp. 36, lines 15-25; p. 37; p. 38, lines1-10. He may recommend termination, but final termination decisions are made by the OJA. *Id.,* p. 38, lines 3-10.

An experienced YGS I staff member can be designated as a "seasoned" staff member, but this occurs only if he or she demonstrates responsible job performance and supervisory skills. Johnson Aff. at ¶¶ 11-13. A seasoned YGS I might be permitted to supervise juveniles without the presence of more experienced staff members, but is not allowed to supervise other YGS I staff. Designation as a "seasoned" staff member does not result in an increase in salary or benefits, but means only that the staff member has demonstrated sufficient responsibility and skills to require less supervision than others at the same level. *Id.*

SWOJC and the OJA have adopted rules regarding inmate conduct as well as policies and rules governing staff conduct. A primary duty of YGS staff is to ensure that juveniles abide by the rules of conduct. As discussed in more detail, *infra,* Mr. Johnson counseled with Plaintiff on many occasions about Plaintiff's failure to enforce SWOJC rules and policies and his lax supervision of the juveniles. Johnson Aff. at ¶¶ 6-9.

SWOJC probationary employees receive monthly performance reviews as well as a mid-term review. These are prepared on forms evaluating specific categories of job performance, and the supervisor conducting the review checks a space indicating whether the employee is "progressing as expected." Defendants' Ex. 6. These reports are then reviewed by Mr. Johnson. Plaintiff's reviews for January, February, and March of 2010 were prepared by Robert Kellison, a Caucasian YGS III, and reflected Plaintiff was progressing as expected in each rating category. *Id.* In April, however, Mr. Kellison found Plaintiff was not progressing as expected in four of the twelve

categories, and noted Plaintiff had "documented difficulties" regarding two categories. Defendants'
Ex. 7.

The review form is accompanied by a document entitled "Performance Management
Process," which explains the performance categories on the form. Defendants' Ex. 8. The areas in
which Plaintiff was not progressing as expected as of April, 2010 included those requiring him to
1) develop "ability and skills in providing juvenile supervision and direct care," apply the
"instructed approved methods of intervention," and understand and follow OJA and SWOJC policies
and procedures; 2) demonstrate "participation in and ability to support" the institutional treatment
program and established procedures; 3) exhibit a "professional and positive attitude" and show
respect to juveniles, staff, and others; and 4) demonstrate the "ability to work with peers and
supervisors in learning problem solving skills and the utilization of the appropriate chain of
command." Defendants' Ex. 7; Ex. 8 at p. 1, ¶¶ 1, 5; Ex. 8 at p. 3, ¶¶ 1, 3.

On April 7, 2010, Plaintiff received a formal oral reprimand[3] regarding inappropriate
language and discourteous conduct toward juveniles. Defendants' Ex. 5. In response, Plaintiff
acknowledged his lack of professionalism and good judgment, and indicated he would improve. *Id.*
However, he later consistently disagreed with criticisms of his performance,[4] typically responding
by criticizing the SWOJC rules and procedures and stating his own methods of juvenile supervision
were superior. Johnson Aff., ¶¶ 6-8. On some occasions, Plaintiff said criticism of his performance
was racially motivated, and Mr. Johnson repeatedly assured him that was not the case. *Id.* at ¶ 9.

---

[3]According to Mr. Johnson, earlier informal coaching and counseling sessions with Plaintiff
were not memorialized in written documents. The first written record of discipline is dated April
7, 2010.

[4]Other issues involving Plaintiff's job performance are discussed in more detail, *infra*.

On May 26, 2010, YGS III Christine Vasquez, a Caucasian female, submitted a complaint about Plaintiff's performance, reporting that she had observed his failure to enforce rules regarding juvenile behavior, and stating other staff had complained that Plaintiff's failure to enforce the rules made it difficult for them to control residents. Defendants' Ex. 9. According to Ms. Vasquez, Plaintiff allowed juveniles to enter unauthorized areas, played games with them in locations where he could not observe others he was assigned to supervise, and joined them in performing rap music and braiding hair when he was supposed to be supervising others. She was concerned that allowing the juveniles to violate the rules restricting their access to certain areas made it difficult for others to supervise them. When she talked with Plaintiff about these concerns, he said the rules do not teach the juveniles anything, and he did not think it was necessary to enforce them. She asked that someone else counsel Plaintiff about what she perceived as his lack of professionalism and respect for his co-workers and the rules they were all required to enforce. When Mr. Johnson counseled Plaintiff about these concerns, Plaintiff did not acknowledge any shortcomings in his behavior.

On May 28, 2010, Plaintiff submitted a written complaint about Mr. Johnson, stating Mr. Johnson criticized him in the presence of other staff and juveniles. Defendants' Ex. 10. Plaintiff did not allege this was discriminatory, but accused his mother in law, Gwen Perry, of instigating unfair criticism because she had a personal vendetta against Plaintiff and wanted to have him fired. Ms. Perry, who is also African American, was a YGS IV at SWOJC. Plaintiff detailed his personal difficulties with Ms. Perry, and added his belief that he was doing a great job. Stating that Mr. Johnson and Ms. Perry were friends, Plaintiff asked that someone else supervise him. He requested a new supervisor, and suggested Phillip Baty, who is Caucasian, or Mr. Gomez, whose race is not reflected in the record.

On June 5, 2010, Mr. Johnson prepared a memorandum of a "corrective counseling" session in which he outlined some deficiencies in Plaintiff's performance, emphasizing Plaintiff's failure to enforce rules and policies and the importance of following the direction of senior YGS staff and working as a team with other staff. Defendants' Ex. 11. Mr. Johnson expressed "great hope" that the counseling would assist Plaintiff in improving his performance, but warned that continued deficiencies would result in "escalation of consequences." *Id.*

On June 16, 2010, Plaintiff received a written reprimand based on an internal investigation of an incident which resulted in physical injury to a juvenile. Defendants' Ex. 12. The incident occurred when Plaintiff allowed a juvenile to enter another juvenile's cubicle without permission. An assault occurred, which required medical attention for a bruised and swollen eye and a laceration. Plaintiff's Ex. 19. SWOJC policy prohibited a juvenile from entering another juvenile's cubicle without permission of the occupant. Plaintiff was reprimanded for failing to enforce this rule. The reprimand was executed by SWOJC Superintendent Marc Norvell, a Native American male. Accompanying the reprimand was a "corrective action plan" which listed actions to be taken by Plaintiff. He was also advised of his right to appeal the reprimand. *Id.* The record does not reflect that he did so.

Plaintiff's mid-year review conference was conducted on July 11, 2010[5], and it noted the same performance deficiencies discussed in his April 2010 monthly review. Defendants' Ex. 18. On July 22, 2010, Mr. Johnson prepared a document reflecting a "corrective coaching" session with Plaintiff. Defendants' Ex. 13. The session was based on an incident in which Plaintiff and a more

---

[5]Although the record reflects the conference was held on July 11, the written record was apparently not presented to Plaintiff until August 9, as it is signed by his immediate supervisor, T. Williams, on that date.

senior staff member engaged in an argument in front of juveniles.  Plaintiff was counseled about the need to cooperate with senior staff and to refrain from arguments in front of residents.   *Id.* According to Mr. Johnson, the senior staff member was also counseled for improper behavior. Plaintiff's Ex. 7, p. 22.

On August 3, 2010, Mr. Johnson counseled with Plaintiff and another African American YGS I, Shawn Hill, after they played basketball with juveniles, a violation of SWOJC procedure. Defendants' Ex. 14.  Both Plaintiff and Mr. Hill were reminded of this policy and directed to abide by the rules in the future.  Mr. Hill agreed he had violated the policy.  Plaintiff's Ex. 7, p. 57. Plaintiff refused to sign the written report of this conference.

On or about August 4, 2010, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"),  charging SWOJC with discrimination based on his race, sex, and religion,[6] and stating the discrimination began on May 28, 2010.  Plaintiff's Ex. 24. The EEOC notice of the charge to the OJA is dated August 6, 2010.  Defendants' Ex. 15.  Upon receipt of the EEOC charge, the OJA conducted an investigation. The investigator, Charles E. Dawson of the Office of Public Integrity, a certified EEO investigator, interviewed Plaintiff and 16 other individuals regarding the allegations, and he prepared an 84-page report.  Plaintiff's Ex. 7. He concluded that Plaintiff's allegations of race, sex, and religious discrimination were not supported by the interviews and evidence.

---

[6]Although the record references an amended charge filed in September, a copy is not included in the record.  Because Defendants do not contend that Plaintiff failed to exhaust his EEOC remedies based on a hostile environment and retaliation, the Court assumes, for purposes of this motion, that these claims were asserted in an amended charge.

After filing his EEOC charge, Plaintiff continued to work at SWOJC. On August 24, 2010, Mr. Johnson prepared a "statement of information" summarizing his previous counseling with Plaintiff, and listing previous counseling sessions. Plaintiff's Ex. 29.  Plaintiff refused to sign this statement.

On September 10, 2010,  Plaintiff submitted a written report accusing other YGS staff of failing to follow SWOJC rules and policies.  Defendants' Ex. 20.   He named several SWOJC staff members who he accused of violating rules, including cursing and being disrespectful of juveniles. He accused others of bringing tobacco into the facility.   Although he describes incidents in which he believed African American juveniles were treated less favorably than Caucasians with regard to rule violations, the report contains no allegation of racial discrimination toward Plaintiff.   He characterizes his report as an effort to ensure that the juveniles are being treated properly by staff.

On September 11, 2010, Plaintiff submitted a written memo as a followup to his September 10 report.  Defendants' Ex. 21.  He expressed concern that, as a result of his September 10 report, he might be made  a "target by fellow staff" who he had criticized.  Again, he stated the purpose of his report was to ensure the proper treatment of juveniles in the facility.

On September 11, 2010, Plaintiff received a monthly review which indicated he was not progressing as expected in two of the same categories noted in previous reports.  Plaintiff's Ex. 30. However, he was rated as progressing as expected with respect to two categories in which he previously received a deficient rating.  *Id.*

On September 27, 2010, Plaintiff assisted other staff in conducting a search of cubicles in one unit of SWOJC.   According to SWOJC Chief of Security Kevin Kopp, staff was searching for a pair of glasses that belonged to a juvenile and were lost or stolen.  Plaintiff's Ex. 41.  Because the

glasses had metal pieces, approximately five to six inches long, Mr. Kopp and other security personnel were concerned they could be used as a weapon. *Id.* Two SWOJC staff members submitted written reports stating that, prior to the time the search was to be conducted, Plaintiff told a group of juveniles in the unit that the search was to be conducted and that staff was searching for a pair of glasses. Plaintiff's Exs. 37, 38, 41. The glasses were not located in the search. Mr. Kopp considered Plaintiff's conduct a serious breach of security because the subject of the search was a potential weapon. Plaintiff's Ex. 41.

Plaintiff's employment was terminated on October 4, 2010. According to the procedure in place at SWOJC, Plaintiff's supervisors did not make the decision to terminate him. Instead, when SWOJC believed some disciplinary action was warranted, the SWOJC superintendent forwarded the employee's file to the OJA division administrator for institutional services with a request for disciplinary action. Final decisions in such cases were made by the OJA. Deposition of former OJA chief of staff Gary Bolin, Plaintiff's Ex. 33, p. 10, lines 1-23. Upon receipt of a termination recommendation, the OJA reviewed the documentation and consulted with OJA's legal counsel. After review by legal counsel, the recommendation was submitted it to the OJA chief of staff for review and a final decision. *Id.,* p. 6, lines 4-15; p. 7, lines 12-25. In this case, SWOJC superintendent Norvell forwarded Plaintiff's file to the OJA, where it was reviewed by Elizabeth Stewart, an African American female, who was OJA's division administrator for institutional services. Deposition of Richard Parrish, Plaintiff's Ex. 34, p. 17, lines 6-21. According to procedure, Ms. Stewart reviewed Plaintiff's file and presented it to legal counsel for further review. Bolin Dep., p. 11, lines 3-13. At the time, Wayne Johnson of the Oklahoma Attorney General's office was the assigned OJA legal counsel. *Id.* Pursuant to this procedure, Wayne Johnson and Ms.

10

Stewart reviewed the recommendation to terminate Plaintiff and forwarded their recommendation to OJA chief of staff  Bolin, who was authorized to make the final decision.  According to Mr. Bolin, when he received and reviewed a recommendation for termination, he was authorized to agree, to direct further investigation, or to impose a different disciplinary action. *Id.,* p. 7, lines 15-25.  In this case, he agreed with the recommendation, and he executed the notice of termination on October 4, 2010.

Application:

Plaintiff's Title VII employment discrimination claims are governed by the burden-shifting analysis in *McDonnell Douglas Corp. v. Green*, 411 U. S. 792, 802-04 (1973).  Accordingly, with respect to his race discrimination claim, Plaintiff has the burden of establishing a *prima facie* case of race discrimination; if he does so, Defendants must then articulate a "legitimate, non-discriminatory reason" for their actions. *McDonnell Douglas*, 411 U.S. at 802.  Defendants' burden is one of production only.  *Id.*  Once Defendants have articulated a non-discriminatory reason for the employment decision, Plaintiff has the burden of proving that such reason was a mere pretext for discrimination.  *McDonnell Douglas,* 411 U.S. at 804.  The ultimate burden of proving discrimination remains at all times with the plaintiff.  *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981);  *McDonnell Douglas*, 411 U.S. at 804-05.

Plaintiff's *prima facie* burden:

a. Title VII race discrimination:

To establish a *prima facie* case of discriminatory discharge based on race, Plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge. *English v.*

*Colorado Dept. of Corrections,* 248 F. 3d 1002, 1008 (10[7] Cir. 2001).[7]  A plaintiff's *prima facie* burden for a discriminatory discharge claim is described as "light," as "only the most baseless of claims fails to satisfy it."  *Zamora v. Elite Logistics, Inc.*, 478 F. 3d 1160, 1171 (10th Cir. 2007).

In this case, it is not disputed that Plaintiff is an African American whose employment was terminated.  Although Defendants contend Plaintiff's job performance was deficient, they do not argue that he lacked the qualifications to perform the job, nor do they contend that the job was eliminated after Plaintiff's termination.  Instead, they argue his termination was unrelated to his race, and was based only on deficiencies in his job performance.

Accordingly, at this stage, Plaintiff has shown the essential elements of his *prima facie* race discrimination claim, and the burden shifts to Defendants to produce a non-discriminatory reason for the termination.

b. Title VII religious discrimination:

To establish his *prima facie* case that he was terminated because of his religion,[8] Plaintiff must show 1) he was terminated; 2) at the time of his termination, his job performance was satisfactory; and 3) some additional evidence to support the inference that he was terminated "because of a discriminatory motive based upon the employee's failure to hold or follow his

---

[7]Although Defendants argue Plaintiff must also show that he was treated less favorably than employees outside the protected class, "a plaintiff does not have to show differential treatment of persons outside the protected class to meet the initial *prima facie* burden under *McDonnell Douglas." English,* 248 F. 3d at 1008 (citing *Kendrick v. Penske Transportation Services, Inc.,* 220 F.3d 1220, 1229 (10th Cir. 2000)).  Instead, such evidence is considered in connection with the plaintiff's burden of showing that the employer's nondiscriminatory reason for the discharge is a pretext for race discrimination.  *Id.*

[8]As Defendants note in their reply brief, Plaintiff expressly states that he is not asserting a Title VII claim based on a failure to accommodate Plaintiff's religious beliefs.  Accordingly, the elements of a failure to accommodate claim are not addressed in this Order.

employer's religious beliefs." *DeFreitas v. Horizon Inv. Management Corp.*, 577 F.3d 1151, 1162 (10th Cir. 2009).

Defendants contend Plaintiff cannot satisfy this burden because he cannot show that his job performance was satisfactory and, even if he could do so, he has not presented evidence showing his termination was motivated by his failure to hold or follow Defendants' religious beliefs.

Plaintiff describes his religion as Ancient Egyptian Spiritual Science, an African religion. His allegations of religious discrimination include 1) he was not allowed to wear a necklace or a ring in the shape of an Ankh; 2) his request to be served vegan vegetarian meals was denied, and he was  not allowed to bring meals into the facility; 3) some  juveniles he supervised incorrectly believed him to be Muslin; 4) he was told not to discuss his religious beliefs with the juveniles; and 5) he was not informed about plans for, or invited to participate in,  a Black History Month program.

 SWOJC had a policy prohibiting employees from wearing jewelry which could cause physical injury to employees or the juveniles they supervised.  Plaintiff wore a ring in the shape of an Ankh, and it measured approximately 1 3/4" in length and 3/4" in width.  His necklace also displayed an Ankh and the face of an African male.  Both the ring and necklace had jagged edges. According to Plaintiff, Ms. Perry, his mother in law, told Plaintiff he could not wear the ring or necklace at the workplace.  Plaintiff stopped wearing the jewelry and did not complain to Mr. Johnson or anyone else.  Plaintiff's Ex. 7, Investigative Report, at p. 73.  Plaintiff offers no evidence that he told anyone at the facility that his jewelry reflected his religious beliefs, nor did he dispute the propriety of the policy as it applied to him until after his termination.  Although Plaintiff notes that the policy was not in writing at the time he was told not to wear his jewelry, he offers no

evidence that employees having other religious beliefs were allowed to wear potentially injurious jewelry.[9]  The evidence also shows  Plaintiff was never disciplined regarding his jewelry.

Plaintiff also claims that the facility's failure to serve vegan vegetarian meals was motivated by religious discrimination against him.  Plaintiff contends he could not eat the food that was served at SWOJC, and he was prohibited from bringing his own food to the facility.  The evidence shows that SWOJC did not permit preparation of special meals, but there is no evidence this was based on anyone's religion.  Business manager Cathy Liermann explained this policy to Plaintiff, and she also told him the policy prohibited bringing food other than prepackaged items into the facility because of concerns that it could contain contraband.  Plaintiff's Ex. 7, Liermann Interview, at p. 23.  This policy applied to all staff.  *Id.*  Ms. Liermann also stated that most meals served included vegetables and a salad, and fruit was available at every meal.   Ms. Liermann told Plaintiff he should raise his request for vegan vegetarian meals at the next staff meeting.  *Id*.   Ms. Liermann could not identify Plaintiff's religion.  *Id.*

Plaintiff also contends Mr. Johnson engaged in religious discrimination by directing him to refrain from discussing his religion with the juveniles.   Mr. Johnson stated he told all Youth Guidance Specialists to avoid discussing certain topics, including gangs, family, politics, religion or sex.   He did not direct this requirement only at Plaintiff.  Johnson deposition, Plaintiff's Ex. 4, p. 59, lines 9-25; p. 60, lines 1-8.   There is no evidence that Mr. Johnson or anyone else treated

---

[9]Plaintiff alleges that he told Gwen Perry he had seen other staff wearing necklaces displaying a Christian cross; however, there is no evidence suggesting he saw anyone wearing religious jewelry having jagged edges or which otherwise could cause injury.

Plaintiff differently from other Youth Guidance Specialists with regard to prohibiting discussions about religion and other topics.[10]

Also lacking evidentiary support is Plaintiff's contention that religious discrimination is shown because some juveniles mistakenly believed him to be Muslim. Plaintiff offers no evidence, other than his own assertion, suggesting that a mistaken belief regarding his religious beliefs had any role in any disciplinary action or the decision to terminate his employment.

Nor does Plaintiff submit evidence sufficient to show that his failure to be notified of a Black History Month program or to be invited to participate in that program was based on religious discrimination. His only suggestion of any connection between the program and religion is his contention that a Christian gospel song was included in the program. The program's primary organizer was Gwen Perry. As noted above, she is African American, and is Plaintiff's mother in law.[11] According to Ms. Perry and others, the Black History Month program is not intended to have a religious theme. Janet Johnson, who planned the program with Ms. Perry, said the guest speaker for the 2010 program was Evangelist Missionary Edna Douglas. Ms. Douglas is affiliated with Greater Love Ministries, but Ms. Johnson does not know its denomination. *See* investigative report, Plaintiff's Ex. 7, p. 40. According to Ms. Johnson, Ms. Douglas spoke about her son, who had been

---

[10]Plaintiff did not complain about Mr. Johnson's comments until after his EEOC charge was filed. Although he contends he heard other staff discussing religion and claims they were not disciplined, the record establishes that disciplinary action is confidential. Johnson Aff., Defendants' Ex. 2. Accordingly, Plaintiff would not have known of such discipline.

[11]The record reflects that, in responding to criticisms of his job performance, Plaintiff often accused Ms. Perry of instigating the criticisms, and he believed she had "a vendetta against" Plaintiff. May 28, 2010 Multipurpose Report submitted by Plaintiff, Defendants' Ex. 10.

incarcerated, and the difficulties caused by his conduct. *Id.* Ms. Johnson did not know of Plaintiff's religious affiliation.

The evidence shows that notices of the program were posted in the facility, and Plaintiff had the same access to the notices as other staff having different religious beliefs. More importantly, he offers no evidence to support any inference that he was not asked to participate in the program because of his religion. Ms. Johnson said she did not specifically ask him to participate, but denied that his religion had anything to do with failing to invite him to do so. Plaintiff's Ex. 7, p. 40.

The evidence before the Court also shows that Plaintiff's supervisors could not identify Plaintiff's religion, and he offers no evidence that his religious beliefs were ever discussed by anyone in a supervisory position or by other staff. Plaintiff fails to offer evidence sufficient to create a material factual dispute on his claim that his termination was motivated by religious discrimination. Accordingly, he cannot satisfy his *prima facie* burden on this claim, and Defendants' motion for summary judgment is granted as to Plaintiff's discrimination claim based on religion.

c. Title VII retaliation claim:

To satisfy his *prima facie* burden on the claim of retaliation for having exercised rights pursuant to Title VII, Plaintiff must show that 1) he engaged in protected opposition to discrimination; 2) his employer subsequently took action that a reasonable employee would have found materially adverse; and 3) there is a causal connection between his protected activity and the adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006); *Argo v. Blue Cross and Blue Shield of Kansas*, 452 F.3d 1193, 1202 (10th Cir. 2006); *Metzler v. Federal Home Loan Bank of Topeka,* 464 F.3d 1164, 1171 (10th Cir. 2006). Title VII protected opposition includes

the filing of an EEOC Charge of Discrimination, but may also consist of "complaining informally to supervisors" about conduct which the complainant believes to be discriminatory. *Medina v. Income Support Division,* 413 F. 3d 1131, 1135-36 (10th Cir. 2005); *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004). However, "[o]pposition to an employer's conduct is protected [by Title VII's retaliation provision] only if it is opposition to a practice made an unlawful employment practice by Title VII." *Petersen v. Utah Dep't of Corrections*, 301 F.3d 1182, 1188 (10th Cir.2002) (internal quotations omitted).

An employee cannot establish a causal connection between the protected opposition and the adverse employment action unless he shows his employer knew he had engaged in such opposition. *Baltazar v. Shinseki*, 2012 WL 2369332, at *3 (10th Cir. June 25, 2012) (unpublished opinion) (citing *Petersen*, 301 F.3d at 1188–89). "An employer's action against an employee cannot be because of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition." *Petersen*, 301 F.3d at 1188-89.

However, evidence of a causal connection requires more than showing the employer knew the employee had engaged in protected activity. There must be a close temporal proximity between the protected action and the adverse employment event to support an inference of retaliatory motive. *Candelaria v. EG & G Energy Measurements, Inc.*, 33 F.3d 1259, 1261-62 (10th Cir. 1994); *Burrus v. United Telephone Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.1982), *cert. denied,* 459 U.S. 1071(1982). This circuit has held that a period of more than three months, without more, is insufficient to establish causation. *Richmond v. Oneok, Inc.,* 120 F.3d 205, 209 (10th Cir. 1997). The lack of temporal proximity does not, however, necessarily defeat causation. *Anderson v. Coors*

*Brewing Company*, 181 F.3d 1171, 1179 (10th Cir. 1999).  Instead, it requires Plaintiff to provide additional evidence to support causation.  *Id.*

In this case, the evidence shows that Plaintiff's employment was terminated approximately two months after he filed an EEOC charge.  The evidence further shows that OJA and SWOJC were aware of the charge when Plaintiff was terminated, as it had conducted an extensive investigation of his allegations.   Accordingly, Plaintiff has presented sufficient evidence to satisfy these elements of his *prima facie* burden for the time period after the filing of his EEOC charge on or about August 4, 2010.

To the extent, however, that Plaintiff attempts to support a retaliation claim based on events prior to August 4, his claim must fail for lack of evidence.  While Plaintiff submitted a written report in May regarding Ms. Perry's purported vendetta against him and his belief that she was causing Mr. Johnson to unfairly criticize him, the content of that complaint contains no allegation that could arguably be construed as asserting claims protected by Title VII.

d. Hostile work environment claim:

To establish a *prima facie* case based on a hostile work environment, Plaintiff must show: (1) he is a member of a protected class; (2) he was subject to unwelcome harassment; (3) the harassment was based on his membership in the protected class or stemmed from a discriminatory animus toward that class; and (4) due to its severity or pervasiveness, the harassment altered a term, condition, or privilege of his employment and created an abusive working environment.  *Tademy v. Union Pacific Corp.,* 614 F.3d 1132, 1144 (10th Cir. 2008); *Harsco Corp. v. Renner,*  475 F. 3d 1179, 1186 (10th Cir. 2007).

18

The Tenth Circuit has consistently held that the  harassment sufficient to establish Title VII liability requires that the workplace "is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Faragalla v. Douglas County School Dist.*, 411 F. App'x 140, 152 (10th Cir. 2011) (unpublished opinion)  (citing *Sandoval v. City of Boulder,* 388 F.3d 1312, 1327 (10th Cir. 2004)); *see also Tademy,*614 F.3d at 1144).  "General harassment" is not actionable unless it is based on the plaintiff's membership in a protected class or stems from animus directed at his class.  *Faragalla*, 411 F. App'x at 152 (citing *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994)).

To evaluate the first prong of a harassment claim, the Court examines "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Trujillo v. University of Colorado Health Sciences Center,* 157 F.3d 1211, 1214 (10th Cir. 1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  "[I]solated and sporadic racial comments, jokes, or slurs" are insufficient to support a racially hostile work environment." *Bolden v. PRC, Inc.*, 43 F.3d 545, 550 (10th Cir. 1994). Plaintiff must not only show he subjectively perceived the environment as hostile or abusive, but that his perception was objectively reasonable. *Davis v. United States Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998), *cert. denied*, 526 U.S. 1039 (1999).  When reviewing a hostile environment claim on summary judgment, the Court must look to the totality of the circumstances, and avoid viewing allegedly discriminatory conduct in isolation. *Penry v. Federal Home Loan Bank*, 155 F.3d 1257, 1262 (10th Cir.1998).  The question is "whether the quantity, frequency, and severity of the racial, ethnic, or sexist slurs create a work

environment so hostile as to discriminate against the minority employee." *Trujillo*, 157 F.3d at 1214.

The evidence in the record is insufficient to create a material factual dispute on Plaintiff's hostile environment claim. The primary evidence of hostility offered by Plaintiff is his consistent contention that Ms. Perry had a vendetta against him and instigated unfounded disciplinary action. Even if that contention is deemed true, it does not support a racially hostile work environment claim because Plaintiff cannot show that any harassment by Ms. Perry, an African American, was racially motivated. Nor is there evidence that her conduct toward him had anything to do with his religion.

Plaintiff also cites a January, 2010 statement by Mr. Johnson that Plaintiff's conduct would be viewed differently from others because he was a young Black man in the "backwoods" of Oklahoma. Mr. Johnson recalled this comment, and stated that it was based on Mr. Johnson's own experience as a Black man in a rural area of Oklahoma, and was in response to Plaintiff's comments that his race was an issue. Investigative report, Plaintiff's Ex. 7, p. 21. According to Mr. Johnson, he was attempting to advise Plaintiff that he should not interpret everything as racial. The Court finds these comments by Mr. Johnson, an African American, do not support the existence of a racially hostile environment.

Plaintiff also states that SWOJC staff member Travis Williams, a Caucasian male, told Plaintiff he would have a better rapport with African American juveniles than Williams. When asked about this during OJA's investigation of the EEOC charge, Mr. Williams said he believed that, based on both Plaintiff's age and race, he would be able to relate to African American juveniles, and he intended the comment to be positive. Plaintiff's Ex. 7, p. 36-37. The Court does not find Mr. Williams's statements racially hostile.

In addition, Plaintiff points to the fact that David Heaton, a Caucasian security officer at SWOJC, had a tattoo displaying the Confederate flag. When asked about this in his deposition, Mr. Heaton displayed the tattoo on his forearm, and it is described as a Confederate flag with a black panther in the center. Heaton Dep., Plaintiff's Ex. 9, p. 14. Heaton explained that he got the tattoo when his was serving in the military; members of his platoon, which was racially mixed, all had the same tattoo. *Id.*, p. 16. According to Mr. Heaton, some of the juveniles who saw the tattoo asked if it was racist, and he explained to them that it was not, and told them its origin. *Id.,* p. 33. Mr. Heaton never had a conversation with Plaintiff about the tattoo or about racial views. *Id.,* p. 37.

Mr. Johnson recalled that Plaintiff told him about Mr. Heaton's tattoo and that Plaintiff believed it meant Mr. Heaton was a racist. Johnson Dep., p. 67, lines 5-25. Mr. Johnson was not aware that Mr. Heaton had a tattoo, and he did not consider it to indicate Heaton was a racist, although Mr. Johnson thought it was inappropriate. *Id.*, p. 70-71. He said that Manitou is near Lawton, and many military men display tattoos or bumper stickers which do not concern him. *Id.* Mr. Johnson told Heaton's supervisor, Kevin Kopp, about Mr. Heaton's tattoo, and Mr. Kopp said he would check on it. *Id.,* pp. 74-75. When Mr. Kopp discussed this with Mr. Heaton, he denied being racist and explained the tattoo's military background. Kopp dep., Plaintiff's Ex. 10, p. 105, lines 2-16. However, Mr. Kopp requested an external investigation by OJA. *Id.* at 103, lines 5-15.

Viewing these incidents and the totality of the circumstances reflected in the evidence, the Court concludes that Plaintiff has submitted insufficient evidence to present a triable issue on his claim of a racially hostile work environment. The evidence presented by Plaintiff is insufficient to permit a reasonable jury to find that the work environment was racially hostile.

Additionally, there is no evidence to support a hostile environment claim based on religion. In fact, the record shows that no supervisor was even aware of Plaintiff's religion, and Plaintiff submits no evidence of any statement or comment that could arguably support a hostile environment based on his religious beliefs.

The Court concludes that Plaintiff has failed to present evidence sufficient to establish a *prima facie* claim of a hostile work environment based on race or religion. Defendants are entitled to judgment on this claim.

<u>Defendants' burden of identifying a non-discriminatory basis for terminating Plaintiff:</u>

Having determined that Plaintiff has presented sufficient evidence to satisfy his *prima facie* burden on his claims of race discrimination and retaliation, the burden shifts to Defendants to show that the decision to terminate Plaintiff was based on justifiable, non-discriminatory reasons. At the summary judgment stage, Defendants' burden "is one of production, not persuasion." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142 (2000). If Defendants produce such evidence, then the burden shifts back to Plaintiff to show the articulated reason is a mere pretext for discrimination. *Id.* Under the burden-shifting analysis, once an employer has met its burden, "summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Plotke v. White,* 405 F.3d 1092, 1099 (10th Cir. 2005).

In this case, Defendants contend Plaintiff was terminated because of unsatisfactory job performance, and the evidence in the record supports this contention. As discussed in detail, *supra,* the evidence establishes that Plaintiff was repeatedly counseled regarding his failure to follow policies and procedures governing the duties of Youth Guidance Specialists and their dealings with

22

juveniles, and he was consistently reminded that he was required to enforce those rules.    The evidence further shows Plaintiff failed to comply with these requirements, and continued to disregard established procedures and did not enforce rules governing the juveniles.  Furthermore, Plaintiff openly voiced his disagreement with Defendants' policies and procedures, stating the rules "didn't teach the juveniles a thing."    Defendants' Ex. 9.   The record as a whole establishes Defendants' contention that there were justifiable non-discriminatory reasons for terminating Plaintiff's employment.

Pretext:

Having found that Defendants have satisfied the burden of demonstrating non-discriminatory reasons for terminating Plaintiff, the burden shifts to Plaintiff to show these reasons were a mere pretext for discrimination.  "A plaintiff demonstrates pretext by showing either 'that a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence.'" *E.E.O.C. v. Burlington Northern & Santa Fe Ry. Co.*, 2010 WL 2803910, at *3 (W.D. Okla. July 15, 2010) (unpublished opinion) (quoting *Texas Dep't Community Affairs v. Burdine*, 450 U.S. 248, 256(1981)).  A plaintiff "demonstrates pretext by producing evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997)).  Such evidence may include "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or

manipulating ... criteria); and the use of subjective criteria." *Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) (quoting *Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Servs.,* 165 F.3d 1321, 1328 (10th Cir.1999)).

In evaluating pretext, the "relevant inquiry" is not whether the employer's "proffered reasons were wise, fair or correct," but whether the employer "honestly believed those reasons and acted in good faith upon those beliefs." *Stover v. Martinez*, 382 F. 3d 1064, 1076 (10th Cir. 2004). "In determining whether the proffered reason for a decision was pretextual, 'we examine the facts as they appear to the person making the decision.'" *Watts v. City of Norman*, 270 F. 3d 1288, 1295 (10th Cir. 2001). The Court does not "act as a super personnel department that second guesses employers' business judgments." *Enderwood v. Sinclair Broadcast Group, Inc.*, 233 F. App'x 793, 798 (10th Cir. 2007) (unpublished opinion) (citing *Smith v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Services*, 165 F. 3d 1321, 1330 (10th Cir. 1999)).

To avoid summary judgment on the issue of pretext, Plaintiff must offer evidence sufficient to create a genuine issue of material fact with regard to whether the articulated reason for the adverse employment decision is pretextual; unsupported conclusory allegations are insufficient. *Cone v. Longmont United Hospital Ass'n*, 14 F.3d 536, 530 (10th Cir. 1994).

The record before the Court reflects that Plaintiff has failed to present sufficient evidence to create a material fact dispute regarding pretext. Although he contends that the circumstances and timing of the decision to terminate him evidence pretext, his contentions are based on his conclusory allegations and suspicions that actions against him were racially motivated or somehow directed at his religious beliefs. The evidence before the Court, including that submitted by Plaintiff, is insufficient to constitute more than a scintilla, and is thus inadequate to overcome summary judgment. Defendants are entitled to judgment on Plaintiff's Title VII claims.

Because Plaintiff's *Burk* claims are governed by the same analysis as is applied to his Title VII race and religious discrimination claims, Defendants are also entitled to judgment on those claims. *See, e.g., Barnes v. Occidental Petroleum Corp.*, 761 F. Supp. 2d 1285, 1295 (N.D. Okla. 2010); *Armstrong v. Vanguard Car Rental, USA, Inc.,* 2009 WL 2230797, at *3 (W.D. Okla. July 22, 2009) (unpublished opinion).

Conclusion:

For the reasons set forth herein, Defendants' motion for summary judgment [Doc. No. 49] is GRANTED.  Judgment shall enter accordingly.

IT IS SO ORDERED this 5th day of December,  2012.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE